192 F.2d 811
 JEKA
v.
RECONSTRUCTION FINANCE CORP.
 No. 550.
 United States Emergency Court of Appeals Heard at Milwaukee, Wis.,
 September 28, 1951.
 Decided November 14, 1951.
 
 Paul D. Kain, Milwaukee, Wis., for complainant.
 Anthony L. Mondello, Attorney, Washington, D. C., with whom J. Gregory Bruce and George Arthur Fruit, Attorneys, all of the Department of Justice, Washington, D. C., were on the brief, for respondent.
 Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.
 McALLISTER, Judge.
 
 
 1
 Complainant seeks review of an order issued by the Reconstruction Finance Corporation pursuant to regulations invalidating claims for meat subsidies. No question is raised as to the legality or validity of the regulations in question.
 
 
 2
 The regulations under which the claims for subsidies were invalidated provided that the "Reconstruction Finance Corporation shall declare invalid, in whole or in part, any claim of any applicant who * * * Is certified by the Office of Price Administration or by the Department of Agriculture pursuant to Amendment 4 to Directive 41, to have exceeded his quota for slaughter." Amendment 4 to Directive 41, referred to in the above regulation, directed the Reconstruction Finance Corporation to withhold subsidies upon certification that a claimant had exceeded his quota for slaughter. In this case, such a certificate was executed by the Office of Price Administration to the effect that complainant had exceeded his quota; and complainant's claims for subsidies were subsequently invalidated. Thereupon, complainant filed a protest setting forth that the certification of the Office of Price Administration of over-quota slaughter was without foundation, assigning as reasons therefor:
 
 
 3
 "(a) That on June 25, 1946, claimant made application to the District Office of the Office of Price Administration, Milwaukee, Wisconsin, for transfer of the quota previously alloted to the Donner Packing Company, * * * which application was made in compliance with regulations then in force governing the issuance of licenses and quotas for class 2 slaughtering houses; that although said application was filed on or about June 25, 1946, the Office of Price Administration never processed said application for reasons unknown to this claimant, although repeated requests were made upon * * * the Office of Price Administration.
 
 
 4
 "(b) That the matters of the alleged over slaughtering for the month immediately preceding June, 1946, were charged in a complaint instituted by Paul A. Porter then Administrator of the Office of Price Administration against this claimant, which action was filed in the District Court for the Eastern Division of Wisconsin, * * and which action was eventually dismissed on its merits.
 
 
 5
 "(c) On July 10, 1946, the Office of Price Administration issued its order," removing all restrictions as to the amount that a slaughterer, in complainant's classification, could handle in his plant, and it was, therefore, impossible for complainant to have exceeded any quota that might have been assigned to him; that, therefore, his claims for September and October, 1946, should have been allowed and paid.
 
 
 6
 On denial of the protest, as above set forth, the complaint now before us was filed. Many interesting questions are raised in the briefs and were argued upon the hearing, but our decision rests upon the question of complainant's compliance with the regulations and a construction of the terms thereof.
 
 
 7
 Complainant submits that, as a transferee of the Donner slaughterhouse, mentioned in his protest, he became entitled, under the regulation, to the slaughter quotas held previously by his transferor, Donner, although his own license contained no authority for such slaughter; that the certification by the Office of Price Administration of overquota slaughter on his part, was, because of his rights as a transferee of such slaughterhouse, without foundation; and that the denial of protest based upon these grounds by respondent Reconstruction Finance Corporation, was arbitrary, capricious, and not supported by substantial evidence.
 
 
 8
 The regulation upon which complainant bases his claim that, as a transferee of the Donner slaughterhouse, he was entitled to his transferor's quota, provides that when a slaughterer of the class in which complainant was listed, acquired, "between September 1, 1945 and April 25, 1946, a slaughtering establishment (including the place of business of a Class 2 slaughterer who had livestock custom slaughtered for him) covered by a valid license and quota bases under Control Order 1 (he) need not apply for a license or quota bases for such establishment under this order in the way provided in section 15."[1] In such a case, the transferee of the establishment must apply to his District Office, in writing, for issuance of a license and assignment of quota bases as a transferee of an establishment for which a valid license and quota bases were outstanding under Control Order 1 and must give the following information, and submit the following documents:
 
 
 9
 "(1) The name and address of the applicant.
 
 
 10
 "(2) The name and address of the Class 2 slaughtering establishment.
 
 
 11
 "(3) The name and address of the person who held a license under Control Order 1 covering such establishment.
 
 
 12
 "(4) The date on which the establishment was transferred to the applicant.
 
 
 13
 "(5) The license of the transferor shall accompany the application unless proof be furnished that it has been lost or destroyed.
 
 
 14
 "(6) Documents or other proof of the transfer.
 
 
 15
 "If the District Office finds the conditions of this paragraph are met, it shall issue a new license to the applicant, and assign to him the quota bases established under Control Order 1 for the establishment and cancel the transferor's license and quota bases. If the transferee applies by May 15, 1946, he may continue to operate the establishment until the new license is received. The license and quota bases of the transferor of the establishment shall be treated as the transferee's license and quota bases for all purposes of this order. If such application is not made on or before May 15, 1946, the transferee may not slaughter any livestock after that date until he has made such application and received the license and quota bases applied for."
 
 
 16
 Complainant, as transferee of Donner, did not apply for the issuance of a license and assignment of quota bases by May 15, 1946. Instead, on June 25, 1946, he filed an application, setting forth certain required data as to the name and address of the person who held the license covering the slaughterhouse in question, as well as certain information regarding complainant's contract of purchase of the premises from a third party; the additional investment made by the company; and a statement that complainant had commenced slaughtering in the slaughterhouse so acquired, utilizing the men and equipment of the Donner Packing Company, while the latter company still remained in the premises and continued to kill cattle for its own purposes. The application concluded with a statement that, on October 5, 1945, the Donner Packing Company formally surrendered the premises, equipment, and all appurtenances to the slaughterhouse to complainant and removed from the premises.
 
 
 17
 The license of the Donner Packing Company did not, however, accompany this application by complainant, nor was there proof furnished, as required by the regulations, that it had been lost or destroyed. The application recited, in this regard, merely that the license of the Donner Packing Company was not in the possession of the applicant.
 
 
 18
 Under the regulations, application must have been made by May 15, 1946, in order for the transferee to have continued to operate the establishment without the issuance of a license. If the application was made after May 15, as in this case, the transferee could not, under the above regulations, slaughter any livestock after that date until receipt of a license and quota basis for which application had been made. Because of noncompliance with the time requirements of the regulations in this regard and the irregular nature of the application, complainant did not meet the express requirements of the regulations providing for quota transfers.
 
 
 19
 It was maintained by complainant's counsel that a prior application had been made by complainant on April 28, 1946, which would have enabled complainant to operate the slaughtering establishment under Donner quotas. But this so-called application does not appear in the record, and on the hearing, it was stated by complainant's counsel that the document in question was no more than an application "at which time the complainant here acquired knowledge of what he could get," and that nothing was done "as far as an application," until June 25, 1946. Without regard to complainant's noncompliance with the regulations, there is no basis in the evidence for holding that complainant's application on June 25, 1946, could be retroactively considered an application as of April 28, 1946, or that the April application could be considered as amended by the June application. For the so-called April application, in no way, purported to comply with the regulations, and was a complete nullity.
 
 
 20
 Other considerations looking to the merits of the claims for subsidies confirm the foregoing determination. First, it is admitted that, if complainant was not entitled to the Donner quotas, he exceeded his quotas for slaughtering and his claims for subsidies were properly invalidated. The contention is advanced by complainant's counsel that, according to the regulations, upon purchase of the equipment and the plant which had been occupied by the Donner Company, complainant became entitled to the Donner slaughter quotas — although the Donner Company would, at the same time, still be entitled to its old license and its quotas in slaughtering in the new and enlarged plant which it had just built and to which it had moved upon leaving the old premises which were thereupon occupied by complainant. To emphasize this contention, complainant declared that its purpose in purchasing the building formerly used by Donner was to secure the Donner quotas because of the fact that complainant had only a small plant prior to that time, and a very small quota. In advancing this claim, complainant argues that the regulations, in their provisions with respect to a slaughterer's acquiring a "slaughtering establishment," are to be construed as acquiring merely the physical structures and equipment used in slaughtering rather than the business of another slaughterer, with good will and like incidents. In holding this contention to be without merit, it is hardly necessary to consider the aims and objects of the legislation governing the license of slaughterers and price control in general. The least to be said, in this regard, is that it was directed to the control of slaughtering and limiting such business to persons granted licenses. But the provisions of the regulations themselves are sufficient to demonstrate that complainant's contentions are untenable. In the first place, in accordance with the regulations heretofore quoted, the transferee of an establishment must, before May 15, 1946, apply for issuance of a license and assignment of quota bases as transferee. The license of the transferor must accompany the application unless proof be furnished that it has been lost or destroyed. If the required conditions are met, the District Office shall issue a new license to the applicant and assign to him the quota bases for the establishment transferred to him, and cancel the transferor's license and quota bases. It is finally provided that the license and quota bases of the transferor of the establishment shall then be treated as the transferee's license and quota bases for all purposes of the order.
 
 
 21
 It is obvious that in the provisions of the regulations, the expression, "slaughtering establishment" of the transferor, means the slaughtering business, and not merely the physical assets of the slaughterhouse and equipment. For the other provisions, above recited, to the effect that when there is such a transfer, the license of the transferor shall accompany the transferee's application for the transferor's quotas; that the transferor's license and quota bases shall be thereupon canceled; and that the license and quota bases of the transferor shall thenceforth be treated as the transferee's license, clearly disclose that such a transferee is substituted in place of the transferor, who ceases to do business — unless he can secure a license anew. In this regard, it is significant that complainant at no time attempted to comply with the requirements of the regulation above mentioned, which provides that in applying for the license and quota bases of a transferor of a slaughtering establishment, the license of the transferor should accompany the application, unless proof was furnished that it had been lost or destroyed. The real reason why the Donner Company's license did not accompany complainant's application, and why no proof was submitted that the license had been lost or destroyed, was that the Donner Company still retained its license and continued to operate under its quota bases. This accounts for the empty gesture of complainant in merely reciting that when he applied for assignment of the Donner quotas, the Donner license was "not in the possession of the applicant."
 
 
 22
 In this case, complainant did not even purchase the slaughterhouse from the Donner Company, but from a third party who was the owner. Under no reasonable construction of the regulations can it be said that complainant was the transferee of the "slaughtering establishment" of the Donner Company.
 
 
 23
 Little need be said concerning complainant's remaining claims. With regard to his contention that the District Court for the Eastern District of Wisconsin had previously dismissed, on its merits, a complaint filed by the Administrator of the Office of Price Administration against the present complainant for the over-slaughtering here in question, it appears that the case was not dismissed until after the control program then in effect had been terminated. As to the argument that since restrictions of quotas for slaughterers in complainant's classification had been removed in July, 1946, and, therefore, his claims for September and October of that year should have been allowed, it appears that by September 1, 1946, quota restrictions were once more in effect and complainant thereafter exceeded his quotas. His claims for subsidies can not, therefore, prevail.
 
 
 24
 In accordance with the foregoing, it is our conclusion that the certification of the Office of Price Administration of overquota slaughter on the part of complainant was sustained by the undisputed facts; and that the denial of complainant's protest by the Reconstruction Finance Corporation was neither arbitrary nor capricious, but fully complied with the pertinent statutes and regulations, and was supported by substantial evidence. A judgment will, therefore, be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 Section 15 reads as follows:
 "Registration and computation of quota bases for persons who began operating or constructing a Class 2 slaughtering establishment between September 1, 1945 and April 25, 1946. (a) Any person who, during the period between September 1, 1945 and April 25, 1946, began operating or constructing a Class 2 slaughtering establishment in which he made a substantial financial investment, may apply to his District Office for issuance of a license and quota bases. The application must be made on OPA form MC-11 and must contain the following information:
 "(1) The name and address of the applicant;
 "(2) The name and address of the Class 2 slaughtering establishment.
 "(3) The date the applicant started operating the establishment.
 "(4) The total liveweight of each species of livestock he slaughtered from the date he started operation to April 25, 1946, by quota periods.
 "(5) The slaughtering capacity of the establishment, by species, including a description of the physical equipment used for slaughtering and cooling;
 "(6) The financial investment made by the applicant with the total amount paid for all tools, machinery, equipment and real estate for the slaughtering establishment.
 "(b) The District Office must forward the entire file to the Regional Office with its recommendation for decision and take such other action as the Regional Office may authorize or direct. If the Regional Office finds that the applicant is eligible to apply as a Class 2 slaughterer, it will authorize the District Office to issue a license to the applicant and assign quota bases for the establishment."